**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BRANCH and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 21, 2017**

# In the Court of Appeals of Georgia

A17A0527. JONES v. THE MEDICAL CENTER OF CENTRAL
GEORGIA, INC.

McFADDEN, Presiding Judge.

John Jones was injured while he was a passenger in an elevator at the Medical Center of Central Georgia, Inc. Jones sued the Medical Center and its elevator maintenance contractor, ThyssenKrupp Elevator Corporation, for his injuries. The trial court granted the Medical Center's motion for summary judgment and Jones filed this appeal.

Jones argues that the trial court erred by granting summary judgment because the material facts are disputed. But Jones has not shown that the Medical Center had superior knowledge of any defect. Jones argues that the Medical Center is vicariously liable for any negligence on the part of ThyssenKrupp, but he has not pointed to

evidence of any such negligence. Finally, Jones argues that the trial court should have applied the rebuttable presumption of a defect that arises for violations of OCGA § 8-2-106, which requires reports of elevator accidents, but he has not shown trial court error. So we affirm.

1. *Facts*.

A trial court properly grants summary judgment when

> there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. We review a grant of summary judgment de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant. A defendant seeking summary judgment need only show an absence of evidence to support an essential element of the plaintiff's case to prevail.

*Brady v. Elevator Specialists*, 287 Ga. App. 304 (653 SE2d 59) (2007) (citations and punctuation omitted).

So viewed, the evidence shows that Jones went to the Medical Center to pick up his wife and his daughter, who had had surgery the day before. His daughter was in a room on the seventh floor. Jones entered the Medical Center and walked to the main bank of elevators. He and another man entered elevator number three. Jones pushed the button for the seventh floor and the other man pushed the button for the

2

eighth floor. The elevator rose to the third or fourth floor then fell downward, crashing into something solid. Jones was able to grab a handrail, which kept him from falling to the floor of the elevator.

The other passenger tried to open the door and then pressed the emergency button. The person who came to their assistance told them from outside the elevator that the car was one-and-a-half feet below floor level and that he needed to get someone to help him move it. About 20 minutes later, Jones felt more jolting. People outside the elevator said they could not open the doors and they needed to get more help. Five minutes later, the doors opened; the elevator was on the ninth floor and the car was level with the floor. Jones injured his feet, legs, knees, and neck in the incident.

Mark Singletary, the assistant director of facilities management at the Medical Center, called and emailed the state Office of Insurance and Safety Fire Commissioner to report the incident. On July 31, 2013, technicians with ThyssenKrupp, the Medical Center's elevator maintenance contractor, met the state inspectors at the Medical Center to investigate the cause of the incident. The state inspectors and ThyssenKrupp technicians tried to recreate the incident conditions for three and a half hours on July 31. The elevator ran normally the entire time. Because

they were unable to find anything wrong with the elevator and could not recreate the conditions of malfunction, the inspectors concluded that the cause of the incident was unknown. After the inspection on July 31, 2013, the state inspectors returned the elevator to service.

The Medical Center, which owns the elevator, purchased the highest level of service plan available from ThyssenKrupp. According to the maintenance agreement, ThyssenKrupp's maintenance program "meets or exceeds any and all requirements of ASME A 17.1-2007 Code, Section 8.6" and its testing program complies with the testing requirements of the American National Safety Code for Elevators and Escalators, ANSI A 17.1, or the governing authority's requirements, if different.

In accordance with the maintenance agreement, ThyssenKrupp performed five-year, annual, and monthly safety tests and regular preventative maintenance on the Medical Center's elevators, including examination, lubrication, and adjustment of the car and hoistway door operating devices and door protection equipment. A ThyssenKrupp mechanic is physically present at the hospital 40 hours per week.

The Medical Center performs its own monthly inspections of its elevators. These inspections involve an experienced mechanic riding every elevator at the

4

Medical Center and stopping at every floor to check for "rough rides and/or uneven stops," among other things.

One week prior to Jones's incident, on July 18, 2013, ThyssenKrupp performed a five-year safety test on elevator three. The five-year test takes one to two days per car. It involves testing multiple functions, including the power door system. Elevator three passed the test.

Two days later, on July 20, 2013, five days before the incident at issue, the Medical Center's mechanic inspected elevator three again. The inspection included the mechanic riding the car to every floor and checking for rough rides and uneven stops. He identified no problem with elevator three.

Singletary, the Medical Center's assistant director of facilities management, testified that he has personal knowledge of the day-to-day maintenance of the hospital; that all elevator incidents are reported to him; and that because no problem had been reported between the July 20 inspection and the July 25 incident, he was unaware of any defective condition. Jones does not dispute that there were no complaints or service calls made about elevator three between July 20, 2013, the date of the Medical Center's mechanic's inspection, and July 25, 2013, the date of the incident. He points to no evidence of any complaints or service calls between July 18,

5

the date of the five-year safety test, and July 20, the date of the Medical Center inspection.

In opposition to the Medical Center's motion for summary judgment, Jones presented the affidavit of John W. Koshak, an expert in elevator safety. Koshak reviewed ThyssenKrupp's account history report, which showed that ThyssenKrupp employees responded to calls about the elevator five or six times during the several months preceding Jones's incident. Specifically, Koshak noted that on March 11, 2013, two ThyssenKrupp employees responded to a call that the elevator doors were slamming. The report listed as the resolution of the problem "door clutch" and "safety edge." On April 24, 2013, a ThyssenKrupp employee responded to a call that elevator three was stuck on the third floor. The report listed as the resolution "adjusted door operator." On May 28, 2013, a ThyssenKrupp employee responded to a call that elevator three was jerking on the third and fourth floors. The report listed as the resolution, "found no problems." On June 26, 2013, a ThyssenKrupp employee responded to a call that the elevator was not responding. The report listed as the resolution "replaced first floor interlock contact." On July 8, 2013, a ThyssenKrupp employee responded to a call that elevator three was stuck on the sixth floor. The report listed as the resolution "adjusted sixth floor door interlock."

Jones's expert testified that these incidents demonstrate that elevator three had a history of issues involving a misalignment of the clutch, "a device used in elevator power door operation to engage the car door to the landing door by a grasping and holding movement." www.mass.gov/anf/docs/dcam/mafma/tutorials/elevator-101.pdf, retrieved May 9, 2017. The expert testified that correct mounting of the clutch is necessary to prevent unwarranted emergency stops, the kind of incident Jones described. Specifically, the expert testified that after work was performed on the clutch on March 11, 2013, there were repeated calls related to the interlock and the car door equipment, which led him to conclude that the clutch was misaligned. Instead of resolving the issue, according to the expert, the technicians replaced and adjusted the interlocks.

2. *The grant of summary judgment.*

Jones argues that in granting summary judgment, the trial court improperly weighed the evidence and ignored evidence of a defect. We disagree.

> [A] building owner owes a duty of extraordinary diligence to elevator passengers and cannot delegate this duty to an independent contractor engaged to repair the elevator. . . . Neither building owners nor elevator maintenance providers, however, are insurers of elevator passengers' safety . . . [and p]roof of the occurrence of a fall, even an

7

elevator-related one, does not establish liability. *The true ground of liability is a defendant's superior knowledge of the defective condition.*

*Brady*, 287 Ga. App. at 307-308 (2) (citations and punctuation omitted; emphasis supplied). Here, the trial court ruled that the Medical Center was entitled to summary judgment because Jones failed to point to evidence that the Medical Center had any knowledge of a defective condition that may have led to the incident in which Jones was injured. The record supports the trial court's order.

Jones points to the incidents referred to by his expert to show that the Medical Center had actual knowledge of the elevator's defect. But all of the incidents occurred before the July 18 and July 20 inspections, in which ThyssenKrupp and the Medical Center mechanic found no problems at all. The Medical Center "had in place an extensive program of elevator inspection and repair, and elevator [three] had been inspected [twice within a week of Jones's] injury, and it was found to be operating properly." *Brady*, 287 Ga. App at 308 (2). Although Jones presented evidence of certain occurrences with elevator three, because of the inspection and maintenance program, elevator three had also been inspected or maintained multiple times during that period, and Jones does "not show that the inspections or maintenance actually performed were negligent or that [the Medical Center] knew or [was] put on notice

8

during these procedures that elevator [three] was defective. Thus, there is no basis for a jury to find that [the Medical Center] knew, or had reason to know, that elevator [three] was defective or presented a danger to passengers on" the date Jones was injured. Id. (citation omitted).

Jones argues that the hospital presented no evidence that it increased or altered its maintenance and inspection program in light of the elevator's age. But as discussed in Division 3 below, he presented no evidence that the Medical Center's maintenance and inspection program, which complied with relevant codes, was inadequate. Further, "[i]t is a matter of speculation whether [the Medical Center's] alleged failure to perform additional maintenance in light of the age of elevator [three] had any connection to the" incident at issue. Id. at 309 (2).

3. *Vicarious liability.*

Jones argues that the trial court failed to recognize that the Medical Center is vicariously liable for ThyssenKrupp's negligence. The trial court did not address the issue of vicarious liablity. Instead, the court ruled that the Medical Center was entitled to summary judgment because there was no evidence that the hosptial had any knowledge of any possible defect with elevator three on the date of the incident. And although Jones argues that the trial court ignored ThyssenKrupp's knowledge

9

in deciding whether the Medical Center had knowledge or breached any duty, he fails to point to evidence that ThyssenKrupp had such knowledge. In fact, he concedes that ThyssenKrupp would have no knowledge of any elevator problems independent of the Medical Center's knowledge.

Jones argues that the trial court erred because the Medical Center was vicariously liable for ThyssenKrupp's negligent inspection and repair of the clutch problems. Jones's expert testified that the defendants breached the standard of care "by following an inadequate maintenance and inspection program, by failing to adjust and/or modify the maintenance and inspection programs in consideration of the advanced age of the elevator in question and/or the occurrence of prior problems with Elevator number 3, namely on the maladjustment of the clutch and not repairing same." This testimony, however, was insufficient to create a question of fact regarding the adequacy of the maintenance and inspection program. "[T]he plaintiff cannot prevail on motion for summary judgment by merely presenting a conclusory opinion that defendant was negligent or failed to adhere to the . . . standard [of care]. [H]e must state the particulars. [H]e must establish the parameters of the acceptable . . . conduct and set forth how or in what way the defendant deviated

therefrom." *Loving v. Nash*, 182 Ga. App. 253, 255 (1) (355 SE2d 448) (1987) (citations and emphasis omitted).

Because Jones has not shown that ThyssenKrupp had independent knowledge of a defect or that the maintenance and inspection program were inadequate, this enumeration of error lacks merit.

4. *Spoliation.*

Jones argues that the trial court erred by finding that he was not entitled to the presumption of spoliation that arises from the hospital's violation of OCGA § 8-2-106. In relevant part this Code section states that an "elevator . . . involved in an accident [involving personal injury, death, or structural damage] shall be removed from service at the time of the accident [and] shall not be repaired, altered, or placed back in service until inspected by a certified inspector for the enforcement authority." OCGA § 8-2-106 (c). A defendant's failure to comply with the statute gives rise to the spoliation presumption under OCGA § 24-14-22 that the evidence would have favored the plaintiff. See *Beach v. B.F. Saul Prop. Co.*, 303 Ga. App. 689, 696 (2) (694 SE2d 147) (2010) (applying presumption under former OCGA § 24-4-22). "[A] trial court has wide discretion in adjudicating spoliation issues, and such discretion will not be disturbed absent abuse." *Phillips v. Harmon*, 297 Ga. 386, 397 (II) (774

11

SE2d 596) (2015) (citation omitted). Jones has not shown that the trial court abused his discretion in determining that no factual dispute existed as to whether elevator three was removed from service.

To prove that the Medical Center failed to comply with OCGA § 8-2-106 (c), Jones relies on the self-contradictory testimony rule of *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 28 (1) (343 SE2d 680) (1986). Specifically, Jones points to the testimony of Chad Hester, one of the ThyssenKrupp employees who released the passengers from the elevator car. In his deposition, Hester first testified that after the passengers were off the car, he and another employee rode elevator number three "up and down the hoistway, . . . trying to get it to mess up again . . . but it never would." Later in his deposition, after taking a brief recess, Hester testified that "now that [he] remembere[d they] did not run the car that day because [they] could not run it until the inspector inspect[ed] it. So [they] did leave it off that day."

Jones argues that construing Hester's contradictory testimony against him leads to the conclusion that the employees placed the elevator back in service before it had been inspected, even though it had been involved in an incident involving personal injury, in violation of OCGA § 8-2-106 (c). But the *Prophecy* rule does not apply.

"In *Prophecy*, [our Supreme Court] held that if, on motion for summary

12

judgment, a respondent offers self-contradictory testimony on a dispositive issue in the case, and if the contradiction is not adequately explained, the contradictory testimony must be construed against the respondent for purposes of summary judgment." *Thompson v. Ezor*, 272 Ga. 849, 851 (1) (536 SE2d 749) (2000) (citations omitted). But the *Prophecy* rule does not apply to non-party witnesses. *Thompson*, 272 Ga. at 851-853 (2). Hester is not a party to this case and his deposition does not reflect that he gave testimony as the Medical Center's or co-defendant ThyssenKrupp's representative under OCGA § 9-11-30 (b) (6). Accordingly, the *Prophecy* rule does not apply.

Jones argues that the testimony of three witnesses besides Hester creates a fact question regarding the Medical Center's compliance with the statute. According to Jones, all three witnesses testified that a July 31, 2013, semi-annual, state inspection form reflected that elevator three was not out of service. At their depositions, the witnesses were asked to review the form, which Jones's counsel clarified was "not related to the incident." One box of the form, labeled "Out of Service Reason," was left blank. In his testimony, Singletary, the Medical Center's assistant director of facilities management, agreed that one box of the form was labeled "Out of Service Reason." Art Justice, an employee of ThyssenKrupp, testified that the form indicated

13

that the elevator was not out of service. And Herman Willingham, a hospital employee, testified that the form did not show an "out of service reason" and that he did not see that the form showed the elevator was out of service at all. But as counsel clarified, this form was not related to the incident; it was related to the state's semi-annual inspection of the elevator. And once the state inspectors completed their inspection relating to the incident, they cleared the elevator for operation. So there was no reason for the form to reflect that the elevator was out of service.

"It was the trial court's job to resolve issues of fact regarding the hotly contested issue of spoliation. . . ." *Wright v. VIF/Valentine Farms Bldg. One*, 308 Ga. App. 436, 443 (2) (a) (708 SE2d 41) (2011). As some evidence supports the trial court's order, Jones has not shown error. Id.

*Judgment affirmed. Branch and Bethel, JJ., concur*.